UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | SA:15-CR-00391(1,2)-OLG |
| | § | |
| | § | |
| v. | § | February 9, 2016 |
| | § | |
| (1) HASSAN SALEM AL-HOMOUD | § | |
| (2) ZAINAB MOHAMED HASAN HATIM | § | |
| AL-HOSANI | § | |
| | § | |
| DEFENDANT(s). | § | |

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE ORLANDO L. GARCIA
CHIEF DISTRICT COURT JUDGE

APPEARANCES:

For the Government:              BETTINA RICHARDSON, AUSA
                                 Office of US Attorney
                                 601 NW Loop 410, Suite 600
                                 San Antonio, Texas 78216


For the Defendant
 Hassan Salem Al-Homoud:         GERALD HARRIS GOLDSTEIN, ESQ.
                                 310 S. St. Mary's, Suite 2900
                                 San Antonio, TX 78205
For the Defendant
 Zainab Mohamed Hasan
 Hatim Al-Hosani:                JOHN A. CONVERY, ESQ.
                                 Hasdorff & Convery, P.C.
                                 1005 South Alamo Street
                                 San Antonio, TX 78210




Produced by mechanical stenography; computer-aided
transcription

<u>P-R-O-C-E-E-D-I-N-G-S</u>

THE COURT SECURITY OFFICER:  All rise.

THE COURT:  Okay.  Good morning.  You may be seated.  Jessica, let me talk to you.

(Pause)

THE COURT:  Okay.  Good morning.  We will now proceed to -- okay.  Mr. Goldstein, tell me the correct pronunciation of your client's name.

MR. GOLDSTEIN:  Hassan Al-Homoud.

THE COURT:  Al-Homoud.

MR. GOLDSTEIN:  Al-Homoud, Your Honor.

THE COURT:  Let me call his case, Mr. Al-Homoud.  So is it correct then to say Mr. Al-Homoud?  Or what is the correct name?

MR. GOLDSTEIN:  Mr. Al-Homoud.  He's a colonel in the--.

THE COURT:  I don't care about the colonel.

MR. GOLDSTEIN:  I understand.

THE COURT:  Let's just stick to what's really relevant.  Mr. Al-Homoud.  Okay.  If you'll get him to the podium.

MR. GOLDSTEIN:  We are ready to proceed, Your Honor.

THE COURT:  Okay.  Good morning, Mr. Al-Homoud.

DEFENDANT AL-HOMOUD:  Good morning.

1          THE COURT:  Mr. Al-Homoud.

2          DEFENDANT AL-HOMOUD:  Yes, sir.

3          THE COURT:  Okay.  If at any time I say something,

4    Mr. Al-Homoud, that you do not understand or wish for me to

5    go over or clarify or if you need some time to visit with

6    your lawyer, please let me know.  Do we understand that?

7          DEFENDANT AL-HOMOUD:  Yes, sir.

8          THE COURT:  Okay.  Good.  Have you had an

9    opportunity to review the presentence report that was

10   prepared in your case?  This is a document that I now hold in

11   my left hand that gives me information about the offense, the

12   details of the offense, and then personal background

13   information such as your educational background, your

14   employment history, what kind of work you've done, your

15   physical and mental health condition, any prior criminal

16   history, if you have any, and information of that kind and

17   character.  And then it gives me a range of punishment I may

18   assess.  Have you reviewed that document, which is the

19   presentence investigation report with your lawyer?

20         DEFENDANT AL-HOMOUD:  Yes, I did.

21         THE COURT:  And you understand the contents of the

22   document.  Is that correct?

23         DEFENDANT AL-HOMOUD:  Yes, sir.

24         THE COURT:  Okay.  Do you have any questions about

25   the document?

1          DEFENDANT AL-HOMOUD:  No, sir.

2          THE COURT:  Mr. Goldstein, any objections?

3          MR. GOLDSTEIN:  No, Your Honor.  We have filed--

4          THE COURT:  There being no objections, the

5     applicable guidelines then are offense level 13, category

6     one, a range of punishment of 12 to 18 months.  Supervised

7     release, one to three years or probation, five years, which

8     will be supervised.  If he's back in the country, it will be

9     supervised.  If he's not, then we don't need to worry about

10    it, do we?

11         MR. GOLDSTEIN:  That's correct, Your Honor.

12         THE COURT:  Okay.  We should, to the very extent

13    possible, always be practical and logical, unless the law

14    directs otherwise.  There's nothing in the law in this

15    particular case that precludes the imposition of logic or

16    practical common sense.  Is that a fair statement?

17         MR. GOLDSTEIN:  That's a fair statement, Your

18    Honor.

19         THE COURT:  Okay.  And it's also correct.

20         MR. GOLDSTEIN:  It is.

21         THE COURT:  Okay.  A fine range of 3,000 to

22    $30,000.  Restitution of $120,000, and a 100-dollar fine.

23    And in this matter, the government and the defense have

24    conferred -- hold on a moment.  Okay.  Mr. Goldstein, will

25    you tell me the contents of the 11(c)(1)(C) agreement?

1    MR. GOLDSTEIN:  Yes, Your Honor.  My understanding

2  is that pursuant to the 11(c)(1)(C) plea agreement, our

3  clients or my client has agreed to plead to Count One of the

4  superseding information.  You are correct with respect that

5  it's a visa fraud offense carrying a maximum of ten years,

6  $250,000 fine.

7    THE COURT:  Let's do it this way.

8    MR. GOLDSTEIN:  Yes.

9    THE COURT:  The proposal is five years probation.

10  Is that correct?

11    MR. GOLDSTEIN:  Yes, Your Honor, five years

12  unsupervised probation.

13    THE COURT:  It's going to be supervised.  Okay.

14  And what is -- what was the proposed fine?

15    MR. GOLDSTEIN:  There was no proposed fine.  Only a

16  restitution, Your Honor.

17    THE COURT:  No, there was going to be a fine.

18    MR. GOLDSTEIN:  But there's nothing proposed in the

19  11(c)(1)(C) agreement.

20    THE COURT:  Hum.

21    MR. GOLDSTEIN:  The Court had mentioned $10,000.

22    THE COURT:  So then that's what it is, right?

23    MR. GOLDSTEIN:  If that's what the Court says,

24  that's what it is, Your Honor.

25    THE COURT:  Okay.  Five years supervised.  And

1    restitution of how much?

2              MR. GOLDSTEIN:  $60,000 per victim for a total of

3    $120,000, Your Honor.

4              THE COURT:  Okay.  Now it's my understanding that

5    the $120,000, has that now been conveyed to the -- or

6    transferred, conveyed, to the two victims in this matter?

7              MR. GOLDSTEIN:  Your Honor, there is pleadings in

8    that regard.  I can show the Court where we have provided and

9    deposited with the registry of the court.

10             THE COURT:  So the answer to my question is, yes,

11   it's been conveyed.

12             MR. GOLDSTEIN:  It is conveyed to the registry of

13   the court.

14             THE COURT:  It's been conveyed to the District

15   Clerk's Office?

16             MR. GOLDSTEIN:  Yes, Your Honor.

17             THE COURT:  That will then be conveyed to the two

18   victims?

19             MR. GOLDSTEIN:  That is my understanding, Your

20   Honor.

21             THE COURT:  Is this right, from the government?

22             MS. RICHARDSON:  That's correct, Your Honor.

23             THE COURT:  It's $120,000.  And does the Clerk's

24   Office have the name and address and other necessary

25   information to transmit the money?

MS. RICHARDSON: Yes, Your Honor. We have--.

THE COURT: Have the two victims, do they still reside in the United States or have they now departed?

MS. RICHARDSON: They are still in the United States.

THE COURT: And what -- how is this money going to be conveyed to them?

MS. RICHARDSON: Through their lawyers.

THE COURT: In Houston?

MS. RICHARDSON: One in Houston and one here in San Antonio.

THE COURT: And as I understand, neither of those private lawyers received any money for their work. Is that correct?

MS. RICHARDSON: That's correct.

THE COURT: So that in fact the two victims individually will get $60,000.

MS. RICHARDSON: Yes, Your Honor.

THE COURT: And they have submitted documents approving of the ultimate resolution in this matter. Is that correct?

MS. RICHARDSON: That's correct. I also have victim-impact statements that both of them had asked that I read into the record.

THE COURT: Okay. Let me see those first. I'll

1  permit you to read them, but I would like to get

2  appropriately informed.

3          (Pause)

4          THE COURT:  Have these copies been made available

5  to defense counsel?

6          MS. RICHARDSON:  No, Your Honor.

7          THE COURT:  Okay.  Okay.  Mr. Goldstein, as part of

8  the plea agreement, your two clients or the two -- pardon me,

9  defendants, are going to be removed from the country.  Is

10  that correct?

11          MR. GOLDSTEIN:  That is correct, Your Honor.  They

12  will voluntarily remove themselves pursuant to the agreement.

13          THE COURT:  Okay. I understand.  And when are they

14  leaving?

15          MR. GOLDSTEIN:  They have tickets to depart

16  tomorrow afternoon, San Antonio to Dallas.

17          THE COURT:  I don't need details.  I just need to

18  know when will they leave.

19          MR. GOLDSTEIN:  Tomorrow, February 10th.

20          THE COURT:  I just need to know they are leaving

21  the country.

22          MR. GOLDSTEIN:  Yes, Your Honor.  We have provided

23  copies of the tickets to the probation office.  And just so

24  the Court will know, Mr. Donald Flanary and Mr. Derek Hilley

25  are going to accompany them to the airport.

1          THE COURT:  I understand.  I don't need to know all

2    these details.  The bottom line is what I need to know is

3    that they are leaving the country.

4          MR. GOLDSTEIN:  Tomorrow.

5          THE COURT:  I don't know care whether they go up

6    281 or 10 or they take the long way down San Pedro to the

7    airport.  I don't care about those details.  I'm interested

8    in what I'm interested in.  Okay.

9          MR. GOLDSTEIN:  Yes.  They have made plans, and

10   those plans have been –– the government has been advised of

11   those plans.  And that actually, the Court was copied with

12   each of these documents, Your Honor.

13         THE COURT:  And the government has told me on more

14   than one occasion that the two victims in this case did not

15   choose or did not want to participate and did not want to

16   participate in the trial.  Is that correct?

17         MS. RICHARDSON:  That's correct, Your Honor.

18         THE COURT:  And you are satisfied in your mind that

19   that was true then and remains true now?

20         MS. RICHARDSON:  Yes, Your Honor.

21         THE COURT:  And do you believe it would have been a

22   difficult burden for the government to have prevailed

23   without –– by prevail I mean obtain a guilty verdict from the

24   jury, without the testimony of the two victims?

25         MS. RICHARDSON:  It would have been difficult and

1    more importantly it would have re-traumatized those victims,

2    even if they did not have to testify.

3                THE COURT:  Even if what?

4                MS. RICHARDSON:  Even if they were not required to

5    testify, an ongoing trial that would have prolonged them

6    receiving restitution, would have re-traumatized them.

7                THE COURT:  Okay.  And one of them, if I recall

8    correctly, is presently suffering or has cancer.

9                MS. RICHARDSON:  That's correct, Your Honor.

10                THE COURT:  And is she receiving the appropriate

11    medical care?

12                MS. RICHARDSON:  She is, Your Honor.

13                THE COURT:  Okay.  Somewhere in Houston?

14                MS. RICHARDSON:  Yes, sir.  MD Anderson.

15                THE COURT:  MD Anderson.

16                MS. RICHARDSON:  That's correct.

17                THE COURT:  Okay.  So, Mr. Goldstein, so the deal

18    is five years supervised probation, a $10,000 fine, which

19    would be paid or has that been paid already?

20                MR. GOLDSTEIN:  It has not, Your Honor, but it will

21    be.

22                THE COURT:  It will be.

23                MR. GOLDSTEIN:  Yes, Your Honor.

24                THE COURT:  60,000-dollar restitution, which has

25    been given to the District Clerk's Office.

1    MR. GOLDSTEIN:  Yes, Your Honor.

2           THE COURT:  And are there any special conditions?

3           MR. GOLDSTEIN:  Only with respect to their

4    voluntarily removal.

5           THE COURT:  Good.  And where are they going to?

6           MR. GOLDSTEIN:  Qatar, Your Honor.  Delhi to Qatar.

7           THE COURT:  Okay.  Fine.  And is your client still

8    in the military?

9           MR. GOLDSTEIN:  He is, Your Honor.

10          THE COURT:  Does he still provide services to the

11   United States?

12          MR. GOLDSTEIN:  Yes, Your Honor.

13          THE COURT:  Will he continue to provide those

14   services to the United States?

15          MR. GOLDSTEIN:  It's my understanding, yes, Your

16   Honor.

17          THE COURT:  Would the country be in a security risk

18   if he were not providing those services to the country?

19          MR. GOLDSTEIN:  I believe so, Your Honor.

20          THE COURT:  Well, you really don't know?

21          MR. GOLDSTEIN:  I'm not an expert, Your Honor.

22          THE COURT:  So, therefore, you really don't know.

23   It's okay to say -- I say that from time to time.

24          MR. GOLDSTEIN:  I understand, Your Honor, and I'm

25   happy if it please the Court that I will say that I am not

1 knowledgeable about military affairs.

2         THE COURT:  The world will not come to an end if he

3 no longer assists the government, will it?

4         MR. GOLDSTEIN:  It will not, Your Honor.

5         THE COURT:  Good.  Okay.  Then that's the

6 applicable guideline.  At this point we will have any

7 allocution.  We'll have your separate allocution, and then

8 you may read either the entire statement or the relevant

9 portions, whichever you choose to read into the record.  And

10 okay.  This -- so you can commence by reading the statement,

11 and then give me your allocution or give me your allocution

12 and then read the statement.  And just read the statement

13 relevant to -- well, to both of them, actually both.  Go

14 ahead.

15         MS. RICHARDSON:  Your Honor, the government's

16 position is that we still stand behind--.

17         THE COURT:  I tell you what, why don't y'all sit

18 down, and you speak at the podium.

19         MS. RICHARDSON:  The government still stands behind

20 the 11(c)(1)(C) that has been presented to the Court, first

21 and foremost because it is the disposition that is in the

22 best interest of the victims in this case.  In addition to

23 the $60,000 for each victim that has been deposited into the

24 Clerk's registry, if the Court will recall, both victims have

25 also received confidential settlements under a civil

1    agreement.  So both of them had already received cash

2    disbursements from the defendant.

3           THE COURT:  In addition to the $120,000 in the

4    District Clerk's Office?

5           MS. RICHARDSON:  That's correct, Your Honor.

6           THE COURT:  And that's a confidential agreement?

7           MS. RICHARDSON:  That's correct, Your Honor.

8           THE COURT:  And that but for the Court's personal

9    intervention, that would never have occurred?

10           MS. RICHARDSON:  That's correct, Your Honor.

11           THE COURT:  Go ahead.

12           MS. RICHARDSON:  And both of these victims, while

13    they were extremely traumatized  and suffered harm, felt

14    compelled to compel us, the government of the United States,

15    to not put them through a public trial and to hold them here

16    in the United States longer than they wanted to be.

17           THE COURT:  Now, the victims understood that the

18    government was prepared and wanted to proceed and that a

19    court and a judge was available to hear the case.  Is that

20    correct?

21           MS. RICHARDSON:  That's correct.  That's correct.

22           THE COURT:  But at their insistence, if I'm

23    correct, they did not want to proceed?

24           MS. RICHARDSON:  That's correct, Your Honor.

25           THE COURT:  Okay.  Go ahead.

1      MS. RICHARDSON:  And if you can imagine the trauma

2  that it would cause for someone who is not comfortable

3  speaking in public and is not comfortable speaking to men to

4  be brought into a courtroom to have to address a courtroom of

5  people in public who are both men and women.  It would be

6  very traumatic.

7      THE COURT:  Okay.

8      MS. RICHARDSON:  But they did want their story

9  told, and so I am prepared to do that.

10      THE COURT:  Okay.  You may proceed to read the

11  statement into the record.  If you'll -- you can just give

12  initials of the victims.

13      MS. RICHARDSON:  I will.

14      THE COURT:  Go ahead.

15      MS. RICHARDSON:  My name is represented by the

16  initials RR, and I have a date of birth and this is my story

17  because I was enslaved in the United States.  I was born in

18  Chara Onnke Daka, Bangladesh.

19      THE COURT:  Okay.  And you need not say the date of

20  birth.

21      MS. RICHARDSON:  I am not.  I am a citizen only of

22  Bangladesh.  I was married, but my husband died of liver

23  cancer in March of 2013 and this left me alone with two

24  children.  My firstborn was born in 2006, and my second in

25  2011.  During the time that my husband was fighting for his

life, I borrowed money from my father to pay for his medical treatment.  After battling cancer for five years, my husband died.  Sadly, four days after my husband died, my in-laws kicked me and my children out of their home.  My children and I returned to the village of my father, mother, brother, and sisters.  My father was a farmer, and I worked for him.  I worked with him and did not get paid.  I did not get paid because we were living with them, and I had borrowed money for my husband's medical treatment.  We lived in a house that had two rooms and a pump for water.  We only had an outhouse for our toilet.  We had two beds.  My children and I slept on one in the first bedroom.  My brother and parents slept on the floor in the second.  My sister slept on the second bed.

During the time I was living with my family, there were times we had enough to eat and others when we did not.  We were very poor as my father was the only breadwinner.  My family continues to live in poverty.  If I were to return to Bangladesh, I would return to the same life, working for my father without pay or seeking employment outside of our village.  Unfortunately, I did not have any money to buy the necessary school supplies for my children.  My children and I hung on to meager meals and daily players for a better life.

In 2014 I thought I had welcome relief.  I spoke with a person known as Nazir who was an agent in our village.  He told me about a job opportunity in Qatar working as a

1  housekeeper.  I signed a contract with an agency.  The

2  contracts were essentially for housekeeping and

3  housecleaning.  The agreement was for me to be paid 800

4  Qatari rial per month in cash.  For this reason, and this

5  reason alone, I left my parents, my siblings, and my children

6  in Bangladesh and traveled to Qatar in May of 2014.  My

7  children remained in Bangladesh, and I have not seen them

8  since.  Once I arrived in Qatar, I went to an office.  Got my

9  medical appointment, and then Zainab Al-Hosani picked me up

10 and took me to her house.  My passport was taken away and was

11 given to my employers.

12         I lived in Qatar from May 2014 until June 23rd,

13 2014 with my employers, Al-Homoud and Al-Hosani.  During this

14 time I had a bedroom and a bathroom and I ate on a regular

15 basis.  I was only allowed to use the phone once.  After this

16 one call, I was never allowed to call and speak to my

17 children or my family again.  It was--.

18         THE COURT:  You mean again ever?

19         MS. RICHARDSON:  That's my understanding.

20         THE COURT:  Okay.  Go ahead.

21         MS. RICHARDSON:  It was during this time that my

22 employer took me and my co-worker Rubi to get fingerprints.

23 We thought it was a requirement to work in Qatar and not part

24 of the process to come to the United States.  I also do not

25 remember signing a domestic employment contract that was in

English, and it was filed in support of my visa to come to the United States.  I also did not meet anyone from the U.S. Embassy in Qatar.  I do remember my employer asking me in Arabic to sign my name on a piece of paper.  I did not know enough Arabic to ask for what it was for, so I signed my name.

On June 23rd, 2014 my employer took us directly to the airport from their home in Qatar.  The only luggage I brought with me to the U.S. were the clothes that Zainab prepared for me.  She told me to put the clothes in a bag, and that my employer put those in her suitcase.  Some of my personal items still remain in Qatar.

I arrived in the United States on or about June 24th, 2014.  My travel to the U.S. came as a shock to me as I did not know I was leaving Qatar until we arrived in the United States.  I knew I had arrived in the U.S. when I saw a sign that said America.  I did not even know I had a visa to come to the United States.  My employers held my passport during my travel since I speak very little, limited Arabic. I spoke no English.  I was unable to tell anybody that I had been forced.  When we arrived at the airport, my employer's son arrived in two separate cars and brought me and my co-worker Rubi and my employer's family from the airport to their house in San Antonio.

That night I was driven by my employer's eldest son

1  to his apartment.  His name is Hamid.  I was taken inside the

2  apartment.  There were two bedrooms with two mattresses in

3  the room where Rubi and I slept.  My employers brought some

4  food for us.  We were not given a key to the apartment.  We

5  were locked in from the outside.  I never tried to open the

6  door because my employers told me that there are bad people

7  in the United States and this made us scared.  I had no

8  contact--.

9              THE COURT:  Now who said this?

10             MS. RICHARDSON:  The defendants told the victims

11 that people in the United States are bad.

12             THE COURT:  Uh-hum.  Go ahead.

13             MS. RICHARDSON:  I never had contact with my

14 neighbor.  My employers would unlock the front the door, pick

15 us up and drop us off and relock the door.  My work hours

16 varied.  My duties for my employers were as a housekeeper.  I

17 would clean the kitchen, bathroom, iron clothes, wash their

18 cars, vacuum, sweep, mop, and make beds, and take out the

19 trash.  I did not cook because they considered me unclean.  I

20 did not have a day off nor was I allowed to take breaks.  If

21 I didn't finish everything on time, my employers and her

22 family would get mad.  They made fun of me and called me

23 names.  They would mock me by saying that I did not speak

24 their language, and that why did I come if I did not do the

25 job.  Their mockery coupled with the way they did not let me

1  out of their sight made me feel small and helpless.  I felt

2  trapped and sad.

3         During the time that my employers held me captive I

4  was fed old, stale bread, tea, sugar, and some boiled

5  chickpeas.  However, I did not have a regular mealtime as my

6  employers did not give me food until nighttime before I would

7  leave their house.  This meant I had to wait to be given food

8  until I left.  The reason for not being given food before I

9  left was that my employers could make sure that I did not

10  have extra food.  The other reason was because I would leave

11  their house -- was because I was not allowed to use their

12  bathroom.  They treated me as if I was unclean.  Since the

13  return to my apartment could take hours, I had to withstand

14  hunger and hold my bodily functions until I returned to my

15  apartment, and they kept Rubi and I locked up.

16         My employers paid the apartment that I stayed in,

17  and they had air conditioning in the summer, but no

18  heating -- they had air conditioning in the summer, but no

19  heating in the winter.  On one occasion I was given medicine

20  for pain.  The pain I had was a headache and nausea.  It took

21  me two days.  Rubi was my co-worker.  She was sick and

22  screamed out in pain every night.  Her stomach would get

23  bloated.  I recently found out she had cancer.  Although my

24  employers never hit me, I did see them hit Rubi.  Rubi saw

25  food in the trash and tried to eat it.  My employer saw this

1  and hit Rubi twice on her hand and twice on her right upper

2  arm with a metal broomstick.

3          Rubi escaped on April the 9th, 2015, which was a

4  Thursday.  It was this day that the police came to my

5  apartment.  A few days later, I went to live at a shelter and

6  was able to get my passport from my employers.  I am now

7  making a fresh start for myself, and I hope to see my

8  children very soon.

9          THE COURT:  That's the statement of one person?

10         MS. RICHARDSON:  That is.  Her initials are RR.

11         THE COURT:  Okay.  And if you'll read the next

12  statement, please.

13         MS. RICHARDSON:  This is -- her initials in the

14  indictment, Your Honor, are represented by R -- this is

15  Rubi's statement.

16         THE COURT:  Okay.

17         MS. RICHARDSON:  I was born on the island of

18  Lomakeskus, Indonesia.  I have lived there most of my life.

19  I was only able to go to school until I was about 13 or 14.

20  I was then married and began working in a rice paddy.  My

21  husband and I had four children, two daughters and two sons.

22  My oldest child lives and works in Malaysia, and my other

23  three live in Lombok.  My husband died when I was pregnant

24  with my youngest child.  This was very hard on me and my

25  children.  After losing my husband and his income, I had

limited resources and decided to apply for a position working overseas with a family, so that I could earn enough to support my children. This is why I applied for an Indonesian passport and accepted work from the Al-Homoud family in Qatar. When I arrived in Qatar in 2014, my employers forced me to cut my hair. They took my cell phone and all my clothes. I worked in Qatar for a short time. And then the Al-Homoud family brought me to the United States.

When I made the decision to leave Indonesia to work in Qatar, I did not know that I would be forced to move thousands of miles further away from my family. Mr. Al-Homoud and Ms. Al-Hosani treated me very badly. I was never paid for my work. I worked seven days a week and was only given one small meal a day, usually consisting of bread. I lost a lot of weight during that time. I was not allowed to use their restroom. I would have to wait to use the restroom until the end of the workday when they took me back to the apartment I shared with another woman who they also mistreated.

Our apartment was almost empty and had no furniture. We only had two blankets and a pillow, and we slept on the floor every night except for the one night we were forced to sleep in a plastic box in the garage at the Al-Homoud family home. When I made mistakes, they would get angry. Sometimes they hit me, and other times they pulled

the front of my veil, which made my head jerk up and hurt my neck. When I was sick, they refused to take me to the doctor. They knew how much pain I was in, but still made me work. One day they asked me to get a chair from the second floor of the house and bring it down to the first floor. This was hard for me. It caused great pain, and I began to cry. They saw me crying, but they would not help or let me rest. When I was working for the Al-Homoud family, I had no way to communicate with my family in Indonesia. They took my cell phone when I was arrived in Qatar, and even though I asked many times to let me call home, they only let me make one phone call the entire time I worked for them in the United States. I miss my children and my parents very much, and I was worried about them, especially since I didn't have money to send to them.

I was devastated that I could not talk to them more than one time. During that time, I found out that my father had been killed in a car accident. It made me so sad that they cut off my communication with my family during the time we were grieving his death. I really thought I would die if I stayed with Mr. Al-Homoud and Ms. Al-Hosani, so I decided I didn't have any choice but to run away and beg for money for food and medicine. I truly believe that if police officers had not found me, fed me, and brought me to the hospital in San Antonio where I was diagnosed with cancer, I would have

1  died.  Because Mr. Al-Homoud and Ms. Al-Hosani did not pay me

2  for my work, I was not able to send money home to care for my

3  family.  This was very hard for me and my children, and I

4  felt very embarrassed.  I had to rely on other people to take

5  care of my children, and I have had to ask other people to

6  send money.  My employers caused me and my family so much

7  pain since I left Lombok in 2014, pain that will be very hard

8  to forget.

9        Despite all of this, and as my lawyer told the

10  Court in her October 22nd letter, I am in support of the plea

11  agreement that the United States government entered into with

12  Mr. Al-Homoud and Ms. Al-Hosani.  I believe such a resolution

13  is in my best interest because it will provide a faster and

14  final result.  This will allow me to return home to care for

15  my family sooner and will result in me receiving criminal

16  restitution funds that I will be able to use to support my

17  mother, my children, and my grandchild.

18        THE COURT:  Okay.  And how long did these two

19  victims -- how long did they work for the defendants?  What

20  period of time?

21        MS. RICHARDSON:  They originally began working for

22  them in the summer of 2014 in Qatar.  They came to the United

23  States where they worked for them until--

24        THE COURT:  Until she escaped on a Thursday

25  afternoon.

1           MS. RICHARDSON:  That's correct, Your Honor.

2           THE COURT:  And how long did they work?

3           MS. RICHARDSON:  I believe it was about eight

4 months.

5           THE COURT:  And during that eight months, from what

6 I gathered from this document, is that they were not

7 afforded an -- other than -- well, not other than, but in

8 addition to being mistreated severely, they were not

9 permitted to make any phone call to their family.  Is that

10 correct?

11           MS. RICHARDSON:  That's correct.

12           THE COURT:  So that their family could reasonably

13 assume that since I'm not getting a phone call, this person

14 must be dead?

15           MS. RICHARDSON:  That's correct.

16           THE COURT:  Okay.  Good.  All right.  Okay.  Those

17 are the statements.  Now let me ask the government, do you

18 wish, Ms. Richardson, do you wish to make a statement?

19           MS. RICHARDSON:  Your Honor.

20           THE COURT:  Or allocution.

21           MS. RICHARDSON:  Yes, Your Honor.  Obviously, the

22 government's position is that this is a heinous offense.  But

23 we have never lost sight of the fact that it is about these

24 two victims.  And our goal from the very beginning has been

25 to bring them to a place of being where they want to be and

1   be restored financially to the degree that they can be.  And

2   for that to be as quick as possible and cause as little of

3   additional trauma as possible.

4              THE COURT:  Okay.

5              MS. RICHARDSON:  And so we, for that reason we ask

6   you to approve the 11(c)(1)(C) and sentence both defendants

7   to probation and immediate removal from the United States to

8   never return again.

9              THE COURT:  Okay.  And now let me ask the

10  government, do the defendants, do they have adult family

11  members in the country?

12             MS. RICHARDSON:  They do.  But it is my

13  understanding they are also departing tomorrow.

14             THE COURT:  Well, do they have -- how many

15  relatives do they have in the country, adults?

16             MS. RICHARDSON:  They have two adult sons.

17             THE COURT:  Do they have any other family?

18             MS. RICHARDSON:  They have a child, a daughter that

19  is a minor.

20             THE COURT:  Does she have servants?

21             MS. RICHARDSON:  The child?

22             THE COURT:  Yes.

23             MS. RICHARDSON:  Not here in the United States.

24             THE COURT:  Hum.  Okay.  Good.  Now, has the

25  government -- and I think we discussed this previously.  Has

1    the government undertaken steps to ensure that when these

2    type of visa transactions occur, are there assurances that

3    this type of criminal activity and/or barbaric behavior is

4    not being committed?

5            MS. RICHARDSON:  I was speaking to our agent,

6    Special Agent Ed Acuna, from the Department of Homeland

7    Security, and he's going to go back to his office today and

8    make sure that that investigation is ongoing.

9            THE COURT:  Okay.  I want the government to

10   understand, whether it's you or Homeland Security or

11   whoever -- and I want a written report on my desk within 45

12   days.  I want to know what steps the government has taken,

13   and I don't want this to be lost in some e-mail, hard drive,

14   or otherwise, anywhere out there. I want a document, not an

15   e-mail.  I want a document, telling me, Judge Garcia, the

16   government has undertaken these steps or the government will

17   undertake these steps to prevent this type of barbaric

18   behavior occurring.  I want to know whether the government

19   has uncovered other examples of these across the country.  I

20   have a feeling and belief, logic alone will tell you that it

21   has occurred and is occurring.  Is that a fair statement?

22           MS. RICHARDSON:  That's a fair statement.

23           THE COURT:  Well, then the government needs to get

24   on the program and take immediate steps, and I want to know

25   in 45 days.  And if the Secretary of Homeland Security needs

 1   to come to San Antonio, that will happen.  If the Attorney

 2   General needs to come to San Antonio, that will happen.  If

 3   we have to have a hearing here or we can get our -- no, no,

 4   several members of Congress involved in this deal, I want

 5   this open.  I want it known.  I want it resolved.  Do we

 6   understand each other, Ms. Richardson?

 7            MS. RICHARDSON:  Yes, Your Honor.

 8            THE COURT:  So the understanding is that I'm going

 9   to have something on my desk in 45 days.  The understanding

10   is that if the Secretary of Homeland Security or the Attorney

11   General need to come down here, they will.  I'm not talking

12   because deputies, assistants, chiefs to deputies, assistants

13   to the assistants.  I'm talking about the top brass.

14            MS. RICHARDSON:  Yes, Your Honor.

15            THE COURT:  You understand that, right?

16            MS. RICHARDSON:  Yes, Your Honor.

17            THE COURT:  And you also understand that when this

18   case initially started I tried every which way to persuade

19   you to let's try this case.  And I have been persuaded, based

20   on the statements and based on your representations before,

21   that the two victims did not want to do this.  But I don't

22   want this to end here.  I want to know if there's other

23   people in a similar or worse circumstances and what efforts

24   the government is doing to clear this up.  It doesn't seem

25   like it would be that hard to fix this problem.  And so do we

1    understand each other?

2              MS. RICHARDSON:  Yes, sir, Your Honor.  I will have

3    that for you.

4              THE COURT:  Okay.  If we don't have -- if I don't

5    have something in 45 days, you and the agent and whoever else

6    I can drag here will be brought here, okay.

7              MS. RICHARDSON:  Yes, sir.

8              THE COURT:  And I don't care if -- the other day I

9    was at some meeting and somebody told it's a federal holiday.

10   I don't know where 45 days is from now, so the best thing to

11   do is get it within 40 days.

12             MS. RICHARDSON:  Yes, sir.

13             THE COURT:  Okay.  All right.  So are you through

14   with your allocution?

15             MS. RICHARDSON:  I am, Your Honor.

16             THE COURT:  Okay.  Mr. Goldstein, do you want to

17   take a stab at allocution?

18             MR. GOLDSTEIN:  May I have a moment, Your Honor?

19             THE COURT:  Yes.

20             (Pause)

21             MR. GOLDSTEIN:  Your Honor, in taking a stab, if

22   I'm--.

23             THE COURT:  And your client will accompany you.

24             MR. GOLDSTEIN:  Please.

25             THE COURT:  Okay.  Go ahead.

1          MR. GOLDSTEIN:  First, as we indicated in our

2    sentencing memorandum, which was very brief, we have no

3    objections to the PSR, the calculations.  We did provide, and

4    what was the formation of this settlement, a detailed

5    attorney proffer which included exhibits of law enforcement

6    statements taken from these individuals at a time when they

7    were no longer within the control of the defendants, at a

8    time when the defendants weren't present in which they made

9    statements very much contrary and contradictory of what you

10   just heard.  What I would ask the Court, if I may file under

11   seal.

12          THE COURT:  No, nothing is going to be under seal.

13   Why should it be under seal?

14          MR. GOLDSTEIN:  Then I would like to file as

15   Defendant's Exhibit 1, that attorney proffer, that each, both

16   the Court and the probation office.

17          THE COURT:  You're telling me that the statements

18   just read are untrue?

19          MR. GOLDSTEIN:  I'm saying that there were numerous

20   statements made to law enforcement, countless statements that

21   are contradictory.

22          THE COURT:  Where is that exhibit?

23          MR. GOLDSTEIN:  If I may tender to the Court,

24   Defendant's Exhibit 1, Your Honor.

25          THE COURT:  Is that here attached to the PSI?

1        MR. GOLDSTEIN:  No, Your Honor.  However, the

2    probation office does have a copy.

3        THE COURT:  Okay.  Go ahead.

4        MR. GOLDSTEIN:  If I may tender this.

5        THE COURT:  Sure, why not.  We have got all day.

6    What time is the flight tomorrow?

7        MR. GOLDSTEIN:  It is at 2:00 o'clock, Your Honor.

8    I have that -- I'm not asking the Court.

9        THE COURT:  You've got -- they say get to the

10   airport an hour an hour-and-a-half before.

11       MR. GOLDSTEIN:  Two hours.

12       THE COURT:  Whatever.  So we have got from now

13   until 11:00 o'clock the next morning, tomorrow morning.

14       MR. GOLDSTEIN:  I'm not asking -- we've been over

15   this.  I'm not here, and as I said in my memorandum, it

16   doesn't make any difference with respect to the calculations.

17       THE COURT:  No, no, no.  Forget about that.  What

18   it makes a difference to is to the truth of what occurred.

19       MR. GOLDSTEIN:  I have no idea what the truth is,

20   Your Honor.  I am only saying--.

21       THE COURT:  Your person is receiving probation.

22   What difference does it make if I--.

23       MR. GOLDSTEIN:  It doesn't.

24       THE COURT:  Well, then okay.  Fine.  I'm

25   interested, because I certainly don't want your client to

agree to anything.

MR. GOLDSTEIN:  He's not.

THE COURT:  I'd admit that was pause.  But it wasn't a period.

MR. GOLDSTEIN:  I apologize.

THE COURT:  You don't need to apologize.  Just go with the flow.  I certainly don't want your client to agree to anything that is not true and correct.  Now, there was some horrible statements made by this victim.  Are all of those statements untrue?

MR. GOLDSTEIN:  I have no idea.  But we're not even contesting that, Your Honor.  I'm just pointing out to the Court that there are two sides to most stories.

THE COURT:  Sure.  Sure.  And most defendants when they show up at SAPD or the FBI, they give contrary statements also, don't they?

MR. GOLDSTEIN:  No question, Your Honor.

THE COURT:  Okay.  Good.

MR. GOLDSTEIN:  And I'm not -- this does not matter with respect to either the guideline calculations or the Rule 11(c)1(C).

THE COURT:  I don't want to talk about the guidelines.

MR. GOLDSTEIN:  We're satisfied with the agreement, Your Honor.  We're not asking for--.

1          THE COURT:  Any allocution?

2          MR. GOLDSTEIN:  Yes, Your Honor.

3          THE COURT:  Okay.  Go ahead.

4          MR. GOLDSTEIN:  My client, pursuant to Rule

5    11(c)1(C), has taken the following steps in accordance with

6    that:  He has purchased--.

7          THE COURT:  I understand all those details.  He has

8    paid the money to the District Clerk's Office.  He got an

9    airline ticket.  He is going to whatever foreign land he's

10   going to go to.  I understand all the details.  I don't need

11   to know the ticket number or the airline.  Come on.  Let's

12   get real.

13         MR. GOLDSTEIN:  Well, and I agree with the Court.

14   Let's get rid of it.  Let me ask the Court, if all we are

15   asking is that the Court assist us in fulfilling the

16   obligation that we have under our plea agreement.

17         THE COURT:  Which is what?

18         MR. GOLDSTEIN:  There's a stipulated voluntary

19   removal stipulation.  Would the Court order--.

20         THE COURT:  Do you want me to sign that?

21         MR. GOLDSTEIN:  Yes, Your Honor.

22         THE COURT:  Yes, all those are details.  Give me

23   allocution.  I don't want details.  I'll gladly sign this.

24         MR. GOLDSTEIN:  Thank you, Your Honor.

25         THE COURT:  And I want to make sure, and you make

1  sure, the government makes sure that this person is never,

2  ever to enter the United States.  Ever.  Ever.

3        MR. GOLDSTEIN:  I understand, Judge.  May I ask --

4  may I make one inquiry of the Court?

5        THE COURT:  Sure.

6        MR. GOLDSTEIN:  In order to ensure that he is able

7  to leave with his family and his wife, I would like to ask

8  the Court if we can be certain that we get a certified copy

9  of that order.

10        THE COURT:  Sure.

11        MR. GOLDSTEIN:  The lawyers are going to go with

12  them to the airport.  What we're concerned about is if they

13  look on the computer when they get to Dallas.

14        THE COURT:  Do you really believe -- the District

15  Clerk's Office will get you a certified copy of the order.

16  That's not a problem.

17        MR. GOLDSTEIN:  No.  What I'm concerned about is if

18  this doesn't get communicated to Homeland Security or in some

19  fashion when they go the airport in Dallas to board the

20  plane, what's going to happen is it's going show this case,

21  and what we need to be certain is that we have some mechanism

22  to ensure that they're able to depart because that's the

23  Court's desire, that's the government's desire, and that's

24  our desire.

25        THE COURT:  Okay.  And let me tell you something.

1       MR. GOLDSTEIN:  Yes, Your Honor.

2       THE COURT:  What you're telling me is you're trying

3  to make sure there's not a glitch.  But, remember, you know

4  how glitches are.

5       MR. GOLDSTEIN:  I know.

6       THE COURT:  If there is a glitch, your client is to

7  stay at the airport until the glitch is corrected, if it's

8  corrected within a few hours.  If it's not corrected, you're

9  to come back here.  He can sit in a jail facility and wait

10  until such time as the glitch is corrected.  All right.

11  That's fair.

12       MR. GOLDSTEIN:  Well, if the Court.

13       THE COURT:  I'm going to sign it right now.  And

14  you-all hope that there is no glitch.  You put your faith in

15  the government.

16       MR. GOLDSTEIN:  I do put my faith in the government

17  and the Court.

18       THE COURT:  And I do too.  Now go ahead.  Give me

19  some allocution.  We'll get this to the right people.

20       MR. GOLDSTEIN:  That's all I ask, Your Honor.

21       THE COURT:  Okay.  Anything else?

22       MR. GOLDSTEIN:  I take -- if the Court is signing

23  that and the Court is going to make sure that the government

24  understands to allow them to leave, I don't have anything.

25       THE COURT:  I want them to leave.

1          MR. GOLDSTEIN:  I know it.

2          THE COURT:  It's not a question of allowing them.

3   Okay.  Go ahead.  Anything else?

4          MR. GOLDSTEIN:  Do you want me to -- I think the

5   PSR adequately explains.

6          THE COURT:  I understand all that.  I'm asking do

7   you have any allocution?

8          MR. GOLDSTEIN:  As long as the Court has signed

9   that order and is going along with the 11(c)(1)(C), I have

10  nothing else to add, Your Honor.

11         THE COURT:  Well, I may amend the 11(c)(1)(C), but

12  we'll go with the flow.  Okay.  Now does your client have any

13  allocution?

14         MR. GOLDSTEIN:  He has asked me to advise the

15  Court.  If the Court would like to hear--.

16         THE COURT:  Does he have any allocution?

17         MR. GOLDSTEIN:  He has asked me to allocute for

18  him, Your Honor.

19         THE COURT:  Does he not know the English language?

20  Go ahead.  What are you going to tell me on his behalf?

21         MR. GOLDSTEIN:  I think the Court is well aware of

22  who he is.

23         THE COURT:  I understand all that.  Tell me the

24  allocution.

25         MR. GOLDSTEIN:  Your Honor, he is 46 years old.

He's been married for 24 years.  He has three children, two sons and a daughter.  And he asks this Court to go along with what the two victims in this case have asked this Court to go along with.  And that is the Rule 11(c)(1)(C), which the Court accepted this plea sometime last year.  That's what he would like.

THE COURT:  That's it?

MR. GOLDSTEIN:  That's it, Your Honor.

THE COURT:  That's it?

MR. GOLDSTEIN:  That's it.

THE COURT:  Not even a hint of an apology.  Let's take a brief recess.  Let's take a brief recess.

THE COURT SECURITY OFFICER:  All rise.

(Brief recess)

THE COURT:  Okay.  Mr. Goldstein.  You may be seated.  Go ahead.

MR. GOLDSTEIN:  Your Honor, my client has asked me to read the following.

THE COURT:  Okay.

MR. GOLDSTEIN:  And I hope the Court understands that we were prepared to go to trial too.

THE COURT:  I understand that.  Go ahead and read your statement.

MR. GOLDSTEIN:  He asked me to advise the Court--

THE COURT:  Do you want to go to trial?

1          MR. GOLDSTEIN:  Your Honor, obviously neither side

2    wants to go to trial.

3          THE COURT:  Okay.  Then, fine.  Go ahead and read

4    your statement now.

5          MR. GOLDSTEIN:  This is on behalf of my client--

6          THE COURT:  Right.

7          MR. GOLDSTEIN:  -- Mr. Al Homoud.

8          I want to tell the Court that I take full

9    responsibility for my conduct.  My conduct has brought shame

10   upon myself, upon my lovely wife, upon my family, and upon my

11   country.

12         THE COURT:  Is that it?

13         MR. GOLDSTEIN:  That's correct.

14         DEFENDANT AL-HOMOUD:  I'm sorry.  I wasn't paying

15   attention.  This situation is very hard at least for me to be

16   here.

17         THE COURT:  Now, when your lawyer said -- well,

18   actually, let me talk to Mr. Goldstein because I don't want

19   you to say anything that's going to end up indicting you

20   again.

21         Mr. Goldstein, when you say your client takes full

22   responsibility for his conduct--

23         MR. GOLDSTEIN:  Yes, sir.

24         THE COURT:  -- does that incorporate the conduct

25   that was contained in the statement or is he taking

1    responsibility for whatever he thinks he is responsible for?

2            MR. GOLDSTEIN:  He takes full responsibility for

3    the conduct that is contained in the information that he has

4    pled guilty to, Your Honor.

5            THE COURT:  No, that wasn't my question.  Let's try

6    it this other way.

7            MR. GOLDSTEIN:  The statement, you mean, the

8    victim--

9            THE COURT:  The victims' statement.  You know, the

10   simple thing to say, Mr. Goldstein.  It's real simple.  You

11   say yes.  This is the way a defendant should apologize:

12           Your Honor, I stand before you.  I've accepted my

13   responsibility.  I accept the responsibility for the conduct

14   that I have led myself and my family here.  And I pledge to

15   you that it will never occur again.  And I apologize to the

16   victims.  That is the way a defendant ought to apologize.

17           MR. GOLDSTEIN:  I understand what the Court is

18   saying.  And I believe my client does apologize to the Court

19   and to the victims and to the government, period.  However,

20   I -- the idea that he has to acknowledge or admit everything

21   that someone else says when there are -- in Exhibit 1 there

22   are statements from witnesses, neighbors, who said these

23   women walked around.

24           THE COURT:  Let me ask you this:  It's real simple.

25           MR. GOLDSTEIN:  Yes.

1          THE COURT:  You're not even under oath,

2   Mr. Goldstein.  But you're an officer of the court.  Now let

3   me ask you this:  Does your client admit or deny that he took

4   their phones away?

5          MR. GOLDSTEIN:  He took them in order -- they had

6   no service.  He maintained control of the passports.  If I

7   may be heard, Your Honor.  But go ahead, please.  You asked

8   me a question, I'd like to be able to respond.

9          THE COURT:  Go ahead and answer.  We have got until

10  11:00 o'clock tomorrow.

11         MR. GOLDSTEIN:  I understand.

12         THE COURT:  Go ahead.

13         MR. GOLDSTEIN:  You asked me a question:  Did he

14  take their phone -- telephones away?  He maintained them for

15  them.  There are records, and they're in this Exhibit 1 where

16  they did make phone calls.  We're not -- I don't want to

17  quibble over each one of these points.  But asking him to

18  accept responsibility for everything is not fair, Your Honor.

19  That is--.

20         THE COURT:  It's not fair.

21         MR. GOLDSTEIN:  There are things in those

22  statements that are simply not true.  These women walked

23  around.  They were not -- they were not locked in.  When the

24  police came to knock on their front door, they opened the

25  door.  The point is that that's not really relevant to what

1 they pled to, which is something that he takes full

2 responsibility for. If you look at the statements from the

3 women, each of them said, we expected to be paid when we

4 returned. That was what they said. And if you remember in

5 one of their statements, they didn't even read the agreement,

6 the contract for employment.

7 The point is that he does take responsibility for

8 his conduct. He does apologize. I've seen him weep in my

9 office. This is not something where the Court needs to worry

10 that this person -- he has been -- all three of his children

11 are U.S. citizens.

12 THE COURT: You need not tell me what I need to

13 worry about.

14 MR. GOLDSTEIN: You're right, Your Honor. I

15 apologize.

16 THE COURT: Okay.

17 MR. GOLDSTEIN: And I'm certainly not trying to

18 offend the Court just by trying to do my due diligence in

19 representing my client, who I do believe is sorry, who I do

20 believe is taking responsibility, Your Honor.

21 THE COURT: Okay. Good. Is that it?

22 MR. GOLDSTEIN: That's it, Your Honor.

23 THE COURT: Any legal reason I cannot proceed?

24 MR. GOLDSTEIN: None, Your Honor.

25 THE COURT: Okay. Then the Court will impose,

1   consistent with the 11(c)1(C) agreement, the Court will

2   impose five years supervised release probation, a $10,000

3   fine, restitution in the amount of $120,000, which I

4   understand has now fully been paid to the District Clerk's

5   office, a 100-dollar special assessment.

6          Your clients -- your client will be removed from

7   the United States never to return again.  The Court has

8   signed, Mr. Goldstein, the agreement that you needed signed,

9   and will be returned to you today so that it can be processed

10  through the Clerk's Office so that hopefully there won't be

11  any glitches.

12         MR. GOLDSTEIN:  We hope not, Your Honor.

13         THE COURT:  Huh?

14         MR. GOLDSTEIN:  We hope not, Your Honor.

15         THE COURT:  You never know.

16         MR. GOLDSTEIN:  I hope I would be able to obtain

17  the Court's assistance in making sure that this is carried

18  out, Your Honor.

19         THE COURT:  What kind of assistance do you need?

20         MR. GOLDSTEIN:  I hope when we get to the airport

21  there won't be no need.

22         THE COURT:  I think the government probably has

23  greater access to the powers that be.

24         MR. GOLDSTEIN:  We're all worried, Your Honor.  And

25  that's all I'm asking.

```
 1              THE COURT:  Okay.  So this is our understanding.
 2              MR. GOLDSTEIN:  Yes.
 3              THE COURT:  If there's a glitch, you notify the
 4    Court.  We'll be back here.  If your client needs to sit in
 5    jail until the glitch is resolved, that's what we're going to
 6    do.  So make sure there is no glitch, Ms. Richardson, okay.
 7    Can you do that?
 8              MS. RICHARDSON:  To the best of my ability, Your
 9    Honor.
10              MR. GOLDSTEIN:  That's what worries me, Your Honor,
11    and I hope the Court can understand.
12              MS. RICHARDSON:  Are you concerned about my
13    ability?
14              (Laughter)
15              MR. GOLDSTEIN:  No, no.  I was concerned about your
16    statement.
17              MS. RICHARDSON:  I know.  I know.
18              MR. GOLDSTEIN:  I have full faith in
19    Ms. Richardson.
20              THE COURT:  Good enough.  There's no levity in any
21    of this.  Okay.  Let's go.  Okay.  I'll get to the next case
22    now.
23              U.S. v -- okay, Mr. Convery, we're going to your
24    case now.  If you'll go to the podium, you and your client,
25    please.  And tell me, Mr. Convery, again, if you'd be kind
```

enough to tell me the correct pronunciation of your client's last name.

        MR. CONVERY:  Al-Hosani.

        THE COURT:  Hosani.  Ms. Hosani.

        MR. CONVERY:  Hosani.  Al-Hosani.

        THE COURT:  Al-Hosani.  Okay.  Ms. Al-Hosani, have you had an opportunity to review the presentence report in your case?  This is a document that gives me details about the offense.  Have you reviewed that document?

        MR. CONVERY:  We have, Your Honor.

        THE COURT:  Okay.  And has your client reviewed the document with you?

        MR. CONVERY:  Yes, Your Honor.

        THE COURT:  Okay.  Does your client have any questions about the document?

        MR. CONVERY:  No, Your Honor.

        THE COURT:  Okay.  Any objections to the report, counselor?

        MR. CONVERY:  No, Your Honor.

        THE COURT:  Okay.  The applicable guidelines as to your client is offense level four, category one, a range of punishment of zero to six months, one year supervised release, or three years supervised probation.  There will be a -- was there a $10,000 fine.

        MR. CONVERY:  That is what the Court was

1    considering.

2             THE COURT:  Okay.  Fine.  Then it's a $10,000 fine.

3    Restitution in the amount of $120,000, which has now fully

4    been paid to the District Clerk's Office, and a special

5    assessment of $100.  It's my understanding there's an 11(c)1C

6    agreement.  The government has previously read two

7    statements.  The same two statements would have been read

8    into the record on this case regarding this particular

9    defendant.

10            Any allocution from the government?

11            MS. RICHARDSON:  Nothing further, Your Honor.

12            THE COURT:  And whatever remarks you made

13   previously are the same remarks you would make here.  Is that

14   correct?

15            MS. RICHARDSON:  That's correct, Your Honor.

16            THE COURT:  Okay.  Mr. Convery, anything?

17            MR. CONVERY:  Yes, Your Honor.  My client does not

18   speak English and asked me to convey to the Court how very,

19   very sorry she is to be here.  She is actually petrified,

20   embarrassed at this situation.  Apologizes to the domestic

21   help, to the maids, to the victims, to the Court, and to her

22   own children.  And I assure the Court this will never, ever

23   happen again.

24            THE COURT:  And your client will never return to

25   the United States.  Is that correct?

1    MR. CONVERY:  That's my understanding.

2    THE COURT:  Okay.

3    MR. CONVERY:  You also have the same stipulated

4 order.

5    THE COURT:  I need that.

6    THE COURTROOM DEPUTY:  I have it right here.

7    THE COURT:  Oh, I have it right here, Mr. Convery.

8 I'll get it signed, and you do whatever you need to do.

9    MR. CONVERY:  I have one other matter.

10    THE COURT:  Hold on.  Yes, go ahead, Mr. Convery.

11    MR. CONVERY:  Your Honor, with respect to both

12 cases, in terms of the 11(c)1C agreement for the unsupervised

13 probation, I understand the Court is saying supervised.

14    THE COURT:  Well.

15    MR. CONVERY:  And I believe that's just in the

16 sense, my only suggestion to the Court is for the order that

17 it's unsupervised.

18    THE COURT:  It will be revised accordingly.

19    MR. CONVERY:  Unsupervised unless they for whatever

20 reason were to return to the United States.

21    THE COURT:  Right.  I agree.  I agree.

22    MR. CONVERY:  Then they have to go to the probation

23 office.  Thank you, Judge.

24    THE COURT:  Now they should know if they ever

25 return to this country, which would be a violation of this

1   order, I'll put them in jail for a very, very, very long

2   time.  But we're not going to have that problem because

3   they're going to go live a life of leisure in their country

4   and leave the other 350-odd million Americans here by

5   ourselves.  Is this correct?

6          MR. CONVERY:  Yes, Your Honor.

7          THE COURT:  Anything else?

8          MR. CONVERY:  No, sir.

9          THE COURT:  Any legal reason I can't proceed?

10         MR. CONVERY:  No, Your Honor.

11         THE COURT:  The Court having considered the

12   guidelines finds them -- I think it's 350 million.  I'm not

13   sure.  We may have grown a little.  The Court will assess a

14   punishment of -- consistent with the agreement and for the

15   reasons stated by the government, punishment of three years

16   probation, a $10,000 fine, $120,000 restitution, which has

17   now been fully paid, and a 100-dollar special assessment.

18         Your client will leave the United States tomorrow.

19   And these documents, stipulated requests for judicial

20   removal, have been properly signed.  I'll give them back to

21   you.  You'll take them to the Clerk's Office.  Process them

22   there.  Do whatever is necessary.  And you're to let me know,

23   Mr. Convery, whether in fact, by tomorrow afternoon, as you

24   call for Mr. Goldstein also, let me know if they have boarded

25   the flight.  If not, we'll be back here, and we'll see what

1    we do.

2             MR. CONVERY:  Yes, Your Honor.

3             THE COURT:  Okay.  Great.  And we have the deal

4    about 45 days from now.  Is that correct?

5             MS. RICHARDSON:  That's correct, Your Honor.

6             THE COURT:  Okay.  Let me see the lawyers up here,

7    and your clients may take a seat.

8             (off-the-record; at sidebar)

9             (Adjournment.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT   )

2  WESTERN DISTRICT OF TEXAS      )

3        I certify that the foregoing is a correct

4  transcript from the record of proceedings in the

5  above-entitled matter.  I further certify that the transcript

6  fees and format comply with those prescribed by the Court and

7  the Judicial Conference of the United States.

8  Date signed:    February 9, 2016.

9

10

                    /s/  Leticia Ornelas Rangel
11                    **LETICIA O. RANGEL**
                    United States Court Reporter
12                    655 East Cesar E. Chavez Blvd.,
                    Room 319A
13                    San Antonio, Texas 78206
                    (210) 244-5039
14

15

16

17

18

19

20

21

22

23

24

25